IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JASON R. FULLER,

                              OPINION and ORDER

            Plaintiff,

                              07-cv-305-bbc

    v.

PATRICIA HEINTZ/CANDEE,

            Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Plaintiff's trademark infringement lawsuit was dismissed with prejudice when he moved to voluntarily dismiss his suit one year after he filed this lawsuit. Defendant's counterclaims were dismissed as moot. Now before the court is defendant's motion for costs and attorney fees, brought pursuant to Fed. R. Civ. P. 54(d).

      Defendant's request for costs will be granted in full because plaintiff does not dispute that she should receive the costs as the prevailing party. Fed. R. Civ. P. 54(d) ("costs . . . should be awarded to the prevailing party"). However, defendant's motion for attorney fees is not so straightforward. The general rule is that parties will pay their own attorney fees. Chambers v. Nasco, Inc., 501 U.S. 32, 45 (1991). Over time, Congress and the courts have carved out exceptions to this rule. Citing three of these exceptions, defendant seeks to

1

recover her attorney fees from plaintiff pursuant to 15 U.S.C. §§ 1117(a) and 1120 and 28 U.S.C. § 1927. After considering the circumstances of plaintiff's lawsuit, I conclude that defendant should be awarded those attorney fees she incurred after plaintiff granted a naked license to Sherri Smeraglia on February 25, 2008 because defendant has shown that at that point plaintiff's lawsuit became "oppressive" and therefore "exceptional" under § 1117(a). Although defendant sought attorney fees for the entire lawsuit, she is not eligible for fees she incurred before plaintiff granted the naked license to Smeraglia under § 1117(a) because she has not shown that plaintiff's lawsuit lacked merit before that time. Likewise, defendant is not entitled to fees under either 15 U.S.C. § 1120 or 28 U.S.C. § 1927 because she failed to show that plaintiff engaged in fraud or that plaintiff's counsel engaged in "vexatious" litigation.

### A. Attorney Fees Pursuant to 15 U.S.C. § 1117(a)

Defendant first seeks attorney fees pursuant to 15 U.S.C. § 1117(a), which states that, for cases brought under the Lanham Act, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." Section 1117 "'provide[s] protection against unfounded suits brought by trademark owners for harassment and the like.'" Finance Investment Co. (Bermuda) Ltd. v. Geberit AG, 165 F.3d 526, 533 (7th Cir. 1998) (quoting Otis Clapp & Son, Inc. v. Filmore Vitamin Co., 754 F.2d 738, 746 (7th Cir.

2

1985)).

When the "prevailing party" is the defendant, a case may be shown to be "exceptional" under § 1117(a) by showing that it was "oppressive," which means that it "lacked merit, had elements of an abuse of process claim, and plaintiff's conduct unreasonably increased the cost of defending against the suit." S Industries, Inc. v. Centra 2000, Inc., 249 F.3d 625, 627 (7th Cir. 2001) (citing Door Systems, Inc. v. Pro-Line Door Systems, Inc., 126 F.3d 1028, 1031 (7th Cir. 1997) and BASF Corp. v. Old World Trading Co., 41 F.3d 1081, 1099 (7th Cir. 1994)).

1. Proof of lack of merit

Plaintiff's lawsuit was dismissed on plaintiff's own motion after he granted a naked license and cancelled his mark. Although I never reached the merits of plaintiff's case, this does not mean he can avoid attorney fees; the question under § 1117(a) is not whether a case was *decided* on the merits, but rather whether it "lacked merit." S Industries, 249 F.3d at 627. Defendant contends that plaintiff's trademark infringement suit lacked merit for three different reasons: because he granted naked licenses rendering the mark invalid, because the mark was a generic term and because the trademark was obtained by fraud.

a. Naked licenses

3

Defendant first contends that plaintiff's case lacked merit because he engaged in naked licensing, both before and during the case. Naked licensing occurs when a trademark owner licenses use of the mark but fails to insure adequate control over the quality of the goods or services produced by the licensee. TMT North America, Inc. v. Magic Touch GmbH, 124 F.3d 876, 885 (7th Cir. 1997) (internal quotations omitted) (naked licensing occurs when licensor allows licensees to depart from quality standards); Barcamerica International USA Trust v. Tyfield Importers, Inc., 289 F.3d 589, 598 (9th Cir. 2002). To insure adequate quality control, a licensor must "take effective steps to ensure that the product [or service] sold by the licensee is of the same quality as the product [or service] sold by the licensor under the same name." AmCan Enterprises, Inc. v. Renzi, 32 F.3d 233, 235 (7th Cir. 1994) (citations omitted). A licensor who engages in naked licensing effectively abandons his trademark rights "against the world," TMT North America, 124 F.3d at 884, and may be estopped from complaining about infringement of the mark. AmCan Enterprises, 32 F.3d at 235 (citations omitted). In short, a grantor of a naked license to use a trademark cannot sustain a trademark infringement suit against anyone; such a suit would "lack merit."

First, defendant contends that plaintiff engaged in naked licensing with Sherri Smeraglia. Plaintiff has admitted that he granted a naked license to Smeraglia; for that reason he dismissed his case and cancelled his mark. However, plaintiff did not grant this

4

naked license until eight months into the lawsuit, on February 25, 2008. Thus, the Smeraglia license shows only that plaintiff's case "lacked merit" as of February 25, 2008. To the extent defendant hopes to rely on this license for attorney fees, it supports only an award of those fees she has incurred since February 25, 2008.

However, defendant contends that plaintiff's case "lacked merit" from the beginning of the lawsuit because of the agreement plaintiff made with Amy Zehe in March 2007, before he filed suit. Defendant contends that the agreement constituted a naked license because plaintiff's counsel made the following statement before the Wisconsin Department of Financial Institutions in the context of disputing that the agreement was a franchise:

> The registration of the TEDDY BEAR PUPPY® mark is a key component to the "Renee's Wonderful World of Teddy Bear Puppies" business arrangement. However, the use of the mark is presented in the documents provided to Amy Zehe as nothing more than a "licensed" use of that mark as opposed to the type of trademark "association" that is typically acknowledged and extensively provided for in a true "franchise" relationship. Even the so-called "Teddy Bear Franchise Agreement" recognizes that a "license to sell" is all that can be purchased. Further, it is doubtful that the trademark "license" presented would even pass muster as a bona fide license since the usual quality control provisions imposed by the owner of such mark are completely lacking in the documents of record. While a concern for the welfare of the dogs is clearly expressed, no provisions are made for policing the use of the mark by, for example, requiring the licensee to periodically provide the Respondents with specimens showing use of the mark.

Dkt. #25-37, at 8. Although plaintiff challenges his own quality control in this statement, he does so in the context of denying that the agreement was a franchise, not in the context

5

of determining the validity of his trademark. The agreement provides just enough quality control to insure consistency and quality of product. The Zehe agreement required that Zehe register the puppies she sold and that the puppies come from "registered" adult parents purchased from plaintiff "to guarantee quality." Dkt. #25-38. In addition, plaintiff agreed to make the "logos, copies of agreements, etc. . . . so that [they] may be exact with every franchise." Id. Finally, a separate franchise certificate related to the Zehe agreement provided that non-compliance with the rules of plaintiff's "American Teddy Bear Association" could result in revocation of Zehe's franchise certificate. Dkt. #25-40. In short, I am persuaded from the quality control mechanisms in place in the Zehe agreement that it was not a "naked" license and does not establish that plaintiff's infringement suit "lacked merit" when he filed it.

b.  Generic term

Next, defendant contends that plaintiff's case lacked merit from the date of filing because "TEDDY BEAR PUPPIES" was a generic term. A term is generic if it is "commonly used to name or designate a kind of goods" or represents "the common linguistic usage" for such goods. Johnny Blastoff, Inc. v. Los Angeles Rams Football Co., 188 F.3d 427, 438 (7th Cir. 1999) (internal quotations and citations omitted). A generic term cannot become a trademark, which designates the source of a product, because it "merely specifies the type,

6

or genus, of thing into which common linguistic usage consigns that product." Bimix, Inc. v. JS & A Group, Inc., 699 F.2d 901, 905 (7th Cir. 1983).

A defendant may establish that a term is generic by pointing to definitions of the term or its components in a dictionary, Liquid Controls Corp. v. Liquid Control Corp., 802 F.2d 934, 936 (7th Cir. 1986) (reliance on dictionary to determine that "liquid controls" is generic term), or by pointing to a contemporaneous use of the term in the marketplace or media, Henry Heide, Inc. v. George Ziegler Co., 354 F.2d 574, 576 (7th Cir. 1965) (finding term "jujubes" generic after considering extensive use of term among manufacturers and in consumer advertising and packaging at time); Harley Davidson v. Grottanelli, 164 F.3d 806 (2d Cir. 1999) (relying on use of "hog" in newspapers and dictionary definitions to find term generic).

Defendant's evidence that "teddy bear puppies" is generic can be broken into two groups: use of the term on websites that she visited on June 4, 2008 and sworn statements by her and several veterinarians attesting to their personal use of the term starting years before plaintiff's mother used the term. Unfortunately, neither type of evidence suffices to show that plaintiff's lawsuit had no merit when he filed it. Neither defendant nor a handful of veterinarians can prove the "common use" of a term simply by stating their personal use of the term. As for the websites, to the extent they could serve as evidence of the common use of the term, they show only the use of the term at the time the websites were visited,

which was June 4, 2008.  Because I have already concluded that plaintiff's decision to maintain this case after February 2008 had no merit, events occurring in June 2008 would add nothing to defendant's claim for attorney fees.

c.  Fraud

Finally, defendant contends that plaintiff's claim lacked merit from the start because his trademark was fraudulently obtained and therefore invalid.  Defendant bears the heavy burden of showing "by clear and convincing evidence" that plaintiff engaged in fraud in obtaining his trademark registration.  Money Store v. Harriscorp Finance, Inc., 689 F.2d 666, 670 (7th Cir. 1982).  Defendant points to two statements that plaintiff made in his application for registration of his trademark that she contends are fraudulent.  First, plaintiff stated that his use of the mark was "substantially exclusive" even though he knew that "at least eight other people" were "using the mark and claiming ownership of it" when he applied.  Second, plaintiff described himself as the "sole proprietor" of the mark even though his mother had original ownership rights.

As for the first statement, defendant's sole proof of fraud is an email dated before the application in which plaintiff stated that he knew that at least eight other people were claiming that they created the term.  However, the fact that plaintiff acknowledged that others had claimed to have created the term does not establish that he knew or believed that

8

any of them had a valid claim to the trademark or that his use was not "substantially exclusive" as he stated. Defendant's "smoking gun" email is not enough evidence to establish fraud.

As for the second statement, defendant's only proof of fraud is plaintiff's admission that his mother was the original owner of the trademark. However, the fact that plaintiff's mother was the *original* owner of the trademark rights does not establish that plaintiff was not the owner *when he applied to register the trademark* and knew that he was not. It is possible that his mother had assigned her rights to him or at least led him to believe that she had. Defendant contends that plaintiff had the burden to prove that he obtained the rights from his mother before he applied to register the mark, but I disagree. Defendant is the one contending that plaintiff lied to the trademark office; she has the burden of proof on the matter. Once again, defendant's evidence of plaintiff's fraud falls short. Because defendant has failed to establish that plaintiff's trademark was obtained by fraud, she has not shown that his case "lacked merit" from the start.

2. Elements of abuse of process claim

In Door Systems, 126 F.3d at 1031, the Court of Appeals for the Seventh Circuit held that an "oppressive" case must be more than merely "a losing suit"; when the defendant is the prevailing party, the plaintiff's lawsuit must have included some elements of the state

law tort for abuse of process, although not necessarily all the elements of the tort. The Wisconsin Supreme Court has adopted the standard set forth in the Restatement of Torts for the tort of abuse of process, requiring that a person has "use[d] a legal process, whether criminal or civil, against another to accomplish a purpose for which it is not designed." Thompson v. Beecham, 72 Wis. 2d 356, 362, 241 N.W.2d 163, 166 (1976) (internal quotations omitted). The essential elements of the claim are that a person (1) willfully use a process (2) with an ulterior purpose (3) in a way not authorized by the process. Id. (quoting Prosser, The Law of Torts, § 121, at 857-58 (4th ed. 1971)). "The gist of the tort is misusing or misapplying process justified in itself for an end other than that which it was designed to accomplish." Strid v. Converse, 111 Wis. 2d 418, 426-27, 331 N.W.2d 350, 355 (1983) (internal quotations omitted). However, there is no abuse of process when a litigant "has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." Thompson, 72 Wis. 2d at 362, 241 N.W.2d 163.

   In this case, defendant contends that several statements made by plaintiff show that his infringement suit was an abuse of process: (1) a letter defendant received in January 2003 in which plaintiff warns that "anyone selling puppies and or dogs under the name TeddyBear [is] infringing upon" his rights, dkt. #25-35; (2) an advertisement that plaintiff placed in 2004, suggesting that defendant may be one of the "hot beds of fraudulent Teddy Bear™ Sales," dkt. #25-36; (3) a letter that plaintiff sent in January 2005 to defendant's

10

previous counsel threatening litigation; and (4) plaintiff's website as it appeared on August 22, 2008, at which time the website included a link to the complaint in this case and suggested that sellers other than those approved by plaintiff's company were misrepresenting and defiling the breed and defrauding buyers, dkt. #58-2.

I agree that plaintiff's behavior shows enough elements of an abuse of process claim to support defendant's contention that this case was an "oppressive" case that warrants an award of attorney fees. Door Systems, 126 F.3d at 1031. In a vacuum, many of plaintiff's letters and other statements appear to be no more than permissible but "vigorous" litigation tactics. However, in context, plaintiff's actions show that he misused his infringement suit for an ulterior motive. First, it is clear that he was seeking to undermine defendant's business, starting well before he thought to register his trademark or file suit, sending threatening letters starting as early as 2004 and making statements to the public suggesting that defendant's teddy bear puppy sales were dishonest and illegal even though plaintiff was aware that others were claiming to have created the term "teddy bear puppies."

Second, plaintiff used his complaint and his underlying trademark registration in a way that is wholly inappropriate. Even after plaintiff's complaint had been dismissed with prejudice, his website included a link to the complaint in the context of suggesting that others were misrepresenting and defiling the breed and potentially defrauding buyers. Likewise, although plaintiff's mark has been cancelled, plaintiff continues to label the term

11

"teddy bear puppy" on his website with an "®" symbol, suggesting that he continues to enjoy trademark rights that he does not. Finally, plaintiff's reckless grant of a naked license in the middle of this lawsuit further suggests that plaintiff did not bring this infringement suit because he was concerned about protecting his trademark rights. As a whole, plaintiff's behavior shows an abuse of process in the context of this lawsuit.

3. <u>Unreasonable increase of defendant's cost of litigation</u>

With respect to the final element of an "oppressive" case, defendant contends that plaintiff's delay in dismissing the lawsuit unreasonably increased her litigation costs. I agree. Plaintiff issued a naked license on February 25, 2008, which automatically invalidated his trademark and undermined his infringement suit. Instead of moving to dismiss this case immediately, plaintiff waited until the day that defendant filed her motion for summary judgment, nearly four months later. Every minute that plaintiff allowed the case to proceed after destroying his own claims was an unreasonable increase in litigation costs.

Plaintiff contends that his lawyer did not find out about the naked license until shortly before the summary judgment motion was filed, and therefore his motion to dismiss his claim was "timely." Indeed, both parties fill several pages arguing over this issue. Both parties miss the point. The question is not whether plaintiff's counsel acted appropriately, it is whether *plaintiff* did. Plaintiff's failure to include his attorney in his decision to grant

12

a license to Smeraglia was unreasonable, as was his failure to let his attorney know of the license promptly.

In sum, defendant has shown that plaintiff's trademark infringement suit was "oppressive" starting on February 25, 2008, when he granted a naked license to Smeraglia. At that time, the case lacked merit. Plaintiff's failure to dismiss his case at that point unreasonably increased defendant's litigation costs. At the same time, defendant has failed to show that plaintiff's trademark infringement suit was "oppressive" for any time earlier in the suit because she has failed to establish that his case lacked merit before he granted the Smeraglia license.

Therefore, defendant will be awarded attorney fees under 15 U.S.C. § 1117(a), but only for those fees incurred after plaintiff granted the Smeraglia license. Defendant may have until November 14, 2008 in which to submit an itemization of her costs and of those attorney fees she has incurred since plaintiff granted the Smeraglia license on February 25, 2008.

## B. Attorney Fees Pursuant to 15 U.S.C. § 1120

Defendant contends that she should be awarded attorney fees pursuant to 15 U.S.C. § 1120, which allows for an award of attorney fees to a party injured by a plaintiff's assertion of trademark rights obtained by fraud. Money Store, 689 F.2d at 678-79. Defendant was

13

required to establish plaintiff's fraud by "clear and convincing evidence," id., but, as I explained above, she has failed to do so.  Therefore, her motion for attorney fees pursuant to 15 U.S.C. § 1120 will be denied.

### C.   Attorney Fees Pursuant to 28 U.S.C. § 1927

Although I have already concluded that defendant will be entitled to some of her attorney fees, defendant has one last argument for receiving all of them.  She contends that plaintiff's counsel has "unreasonably and vexatiously" multiplied the proceedings in this case and should be held liable for her attorney fees under 28 U.S.C. § 1927.  Defendant contends that fees are appropriate under § 1927 for many of the same reasons that she sought fees under the other statutes: because plaintiff's case lacked merit from the start and because dismissal was not filed until a summary judgment motion was filed.  However, defendant has failed to establish that the case lacked merit from the start and she has no evidence that plaintiff's attorney was at fault for the long delay that occurred before this case was voluntarily dismissed.  Aside from those points, the only additional point that defendant makes is that plaintiff's counsel "chuckled" and told her counsel, "good luck trying to collect [on this motion for attorney fees]."  Such a statement falls far short of showing that plaintiff's counsel "unreasonably and vexatiously" multiplied the proceedings in this case or even engaged in the "'serious and studied disregard for the orderly process of justice'"

14

required to warrant attorney fees. Ross v. City of Waukegan, 5 F.3d 1084, 1089 n.6 (7th Cir. 1993) (quoting Kiefel v. Las Vegas Hacienda, Inc., 404 F.2d 1163, 1167 (7th Cir. 1968)). Therefore, defendant's motion for attorney fees under § 1927 will be denied.

## ORDER

IT IS ORDERED that

1. Defendant Patricia Heintz/Candee's motion for costs and attorney fees (dkt. #57) is GRANTED in part and DENIED in part. The motion is granted as to defendant's request for costs and defendant's requests for the attorney fees that she has incurred since plaintiff Jason Fuller granted a naked license to Sherri Smeraglia on February 25, 2008; it is denied as to defendant's request for attorney fees incurred before that date.

2. Defendant may have until November 14, 2008 in which to submit an itemization of her costs and of those attorney fees she incurred since plaintiff Jason Fuller granted a naked license to Sherri Smeraglia on February 25, 2008.

3. Plaintiff may have until November 28, 2008 in which to file an objection to the amount of any itemized costs and fees.

4. Defendant may have until December 5, 2008 in which to file a reply.

Entered this 4th day of November, 2008.

                                              BY THE COURT:

                                              /s/

                                              _____
                                              BARBARA B. CRABB
                                              District Judge